Attachment 1:
supporting documents

**Shadi Khademi**
**2201 N. Shartel Ave.**
**Oklahoma City, Oklahoma, 73103**
**9704123597**
**ShadiKhademi@icloud.com**
**11/17/2026**
**Federal courthouse of Oklahoma**
**200 Northwest 4th Street,**
**Oklahoma City, OK 73102**

**Re: Petition to File Civil Action – Gender Discrimination (Title VII)**
**EEOC Charge No.: 564-2026-02415**

Notice of Right to Sue Date: **08/20/2026**

Dear Clerk of Court:

I am submitting this petition and accompanying complaint to initiate a civil action against **[Employer Name]** for unlawful gender discrimination in violation of **Title VII of the Civil Rights Act of 1964**. The United States Equal Employment Opportunity Commission (EEOC) has issued a **Notice of Right to Sue**, which authorizes me to proceed with litigation in federal or state court. Under federal law, I must file this lawsuit within **90 days of receiving the notice.**
The EEOC has closed its investigation and provided the required notice permitting me to pursue my claims independently. As outlined in the EEOC's guidance, the Notice of Right to Sue grants permission to file suit and confirms that administrative prerequisites have been satisfied

. My claim involves discriminatory treatment based on gender, a protected class under federal law.
Enclosed please find the following documents for filing:

- A copy of the **EEOC Notice of Right to Sue**
- A copy of the **EEOC Charge of Discrimination**
- My **civil complaint** alleging gender discrimination
- Any additional supporting documents required by the court

Please process this filing and return any stamped copies or confirmations to the address listed above. If additional information or fees are required, please notify me so I may promptly comply.

Thank you for your assistance.

Sincerely,

Shadi Khademi

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## CHARGE OF DISCRIMINATION

EEOC Form 5A (August 2023)

For Official Use Only – Charge Number: 564-2026-02415

| | |
|---|---|
| **Personal Information** | First Name: Shadi MI: ____ Last Name: Khademi<br>Address: 2201 N. Shartel Ave. Apt.: ____<br>City: OKC County: Oklahoma city State: Ok Zip Code: 73103<br>Phone: 9704123597 Home ☐ Work ☒ Cell ☐ Email: Khademi.shadi20@gmail.com |
| **Who do you think discriminated against you?** | Employer ☒ Union ☐ Employment Agency ☐ Other Organization ☐<br>Organization Name: OMRF<br>Address: 825 NE 13th St Suite: ____<br>City: Oklahoma City State: Ok Zip Code: 73102 Phone: 4052716673 |
| **Why you think you were discriminated against?** | Race ☐ Color ☐ Religion ☐ Sex ☑ National Origin ☐ Age ☐ Pregnancy ☐<br>Disability ☐ Genetic Information ☐ Retaliation ☐ Other ☐(*specify*) |
| **What happened to you that you think was discriminatory?** | **Date of most recent job action you think was discriminatory:** 5/1/2026<br>**Also describe briefly each job action you think was discriminatory and when it happened (estimate).**<br><br>I was never hired back after FMLA despite applying and got a very negative attitude and approach and sometimes even scolding or ridicule and avoidance behavior from other women who used to know me |
| **Signature and Verification** | I understand this charge will be filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address, phone, or email. I will cooperate fully with them in the processing of my charge in accordance with their procedures.<br><br>I understand by signing below that I am filing a charge of employment discrimination with the EEOC. I understand that the EEOC is required by law to give a copy of the charge, which includes my allegations and my name, to the organization named above. I also understand that the EEOC can only investigate charges of job discrimination based on race, color, religion, sex, national origin, age, disability, genetic information, or based on retaliation for filing a charge of job discrimination, participating in an investigation of a job discrimination complaint, or opposing job discrimination.<br><br>**I declare under penalty of perjury that the above is true and correct.**<br><br>**Signature:** Shadi Khademi **Date:** 6/9/2026 |

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Oklahoma City Area Office**
215 Dean A McGee Avenue, Suite 524
Oklahoma City, OK 73102
(405) 666-0360
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 08/20/2026

**To:** Shadi Khademi
2201 N. Shartel Ave.
Oklahoma City, OK 73103

Charge No: 564-2026-02415

| | |
|---|---|
| EEOC Representative and email: | Shane Duncan, Federal Investigator<br>shane.duncan@eeoc.gov |

## DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 564-2026-02415.

On behalf of the Commission,

Digitally Signed By:Holly Waldron Cole
08/20/2026

Holly Waldron Cole
Director

cc: Samuel R Fulkerson, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.

Oklahoma Medical Research Foundation

Please retain this Notice for your records.

## INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 564-2026-02415 to the District Director at David Davis, 1222 Spruce St Rm 8 100, St Louis, MO 63103.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 564-2026-02415 to the District Director at David Davis, 1222 Spruce St Rm 8 100, St Louis, MO 63103.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

# CHARGE OF DISCRIMINATION

Form 5 (06/24)

This form is affected by the Privacy Act of 1974.
See attached Privacy Act Statement and other information before completing this form.

| CHARGE PRESENTED TO: | AGENCY CHARGE NO. |
| --- | --- |
| EEOC<br>Oklahoma Attorney General's Office, Office of CR Enforcement | 564-2026-02415 |

Name *(indicate Mr., Ms., Mrs., Miss, Dr., Hon., Rev.)*: Shadi Khademi

Phone No.: (970) 412-3597

Year of Birth:

Mailing Address: 2201 N. Shartel Ave.

Oklahoma City, OK 73103

Named below is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency that I believe discriminated against me or others.

Name: Oklahoma Medical Research Foundation

No. Employees, Members: 201 - 500 Employees

Phone No.:

Mailing Address: 825 NE 13th St

Oklahoma City, OK 73104, UNITED STATES OF AMERICA

Name:

No. Employees, Members:

Phone No.:

Mailing Address:

DISCRIMINATION BASED ON:

Sex

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 05/01/2026

Latest: 06/04/2026

THE PARTICULARS ARE:

I was previously employed by the above referenced employer from on or around October 8, 2018, until I took FMLA, on or around September 22, 2022. I had no discipline and I was a high performer during my previous employment.

On or around May 1, 2026, I applied for Assistant/Associate/Staff Scientist-Lewis Lab, which was the same position that I was successful at previously.

On or around June 4, 2026, I received an email stating that they had chosen to proceed with other candidates whose qualifications and experience more closely match the needs of the position. I was not offered an interview and after requesting clarification as to why I was less qualified, I was ignored.

I believe I was not hired for the position based on my sex (female), in violation of Title VII of the Civil Rights Act of 1964, as amended.

EEOC No. 564-2026-02415 | FEPA No.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct, and that I have read each page of this form.

Digitally Signed By: Shadi Khademi
06/24/2026

Charging Party Signature & Date

If a state or local Fair Employment Practices Agency (FEPA) requires notarization, you may need to sign the charge in the presence of a notary. If so, please do so here.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief.

______________________________

Notarized Signature of Charging Party

Subscribed and sworn to before me this date:

Signature of Notary______________________________

Printed Name ______________________________

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Oklahoma City Area Office**
215 Dean A McGee Avenue, Suite 524
Oklahoma City, OK 73102
(405) 666-0360
Website: www.eeoc.gov

07/09/2026

Shadi Khademi
2201 N. Shartel Ave.
Oklahoma City, OK 73103

Re: Shadi Khademi v. Oklahoma Medical Research Foundation

EEOC Charge Number: 564-2026-02415

Oklahoma Medical Research Foundation has submitted a Position Statement in response to your EEOC Charge of Discrimination, 564-2026-02415, and it is available in the EEOC Public Portal for your review. Please log-in to the EEOC Public Portal as soon as possible to download and review the Position Statement and any attachments or supplements.

If you would like to respond to the Respondent's Position Statement or provide additional evidence or information to be considered in this investigation, please upload your response/evidence to the EEOC Public Portal by 08/08/2026.

This is your opportunity to provide any additional information you believe is relevant to support your case. There is no specific format required for your response; however, if you disagree with any information the employer provided, please state what you disagree with, explain why you disagree, and provide information supporting your explanation. If there are witnesses that have information about the allegations raised in your charge, be sure to provide their names, contact information, and a summary of what you expect they would say.

If you do not submit additional information by the deadline, EEOC will proceed based on the available evidence. If you do submit additional information by the deadline, EEOC will evaluate the information. EEOC may contact you if additional information is needed for the investigation. If, after reviewing the evidence, it appears that further investigation will not result in the finding of a violation, the EEOC will dismiss the charge and issue you a Determination and Notice of Rights, which gives you 90-days to file a lawsuit if you wish to pursue your claims further. Please note that if your charge alleged one or more allegations under the Equal Pay Act (EPA), you already have the right to sue under the EPA (filing an EEOC charge is not required). EPA lawsuits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.

Please be aware that by receiving these documents before you have filed a lawsuit based upon your charge, you agree that you will only share them with persons in a privileged relationship with you, such as a spouse, clergy, or medical, financial, or legal advisor.

If you have questions, please contact SHANE DUNCAN by telephone at (913) 340-8821 or email at SHANE.DUNCAN@EEOC.GOV.

Sincerely,

07/09/2026

SHANE DUNCAN
EQUAL OPPORTUNITY INVESTIGATOR

Cc.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Oklahoma City Area Office**
215 Dean A McGee Avenue, Suite 524
Oklahoma City, OK 73102
(405) 666-0360
Website: www.eeoc.gov

August 20, 2026

Via EEOC Public Portal

Re: Shadi Khademi v. Oklahoma Medical Research Foundation
EEOC Charge Number: 564-2026-02415

Dear Ms. Khademi:

The EEOC has determined that the agency will not proceed further with its investigation of your charge. EEOC makes no determination about whether further investigation would establish violations of the statute(s). The EEOC has completed the processing of your charge and is issuing to you a Determination and Notice of Rights, which will allow you to pursue your claims further by filing a private lawsuit within ninety (90) days of your receipt of EEOC's official notice of dismissal.

Sincerely,

/s/ Shane Duncan
Federal Investigator

Ogletree Deakins

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
*Attorneys at Law*
The Heritage Building
621 N. Robinson Ave., Suite 400
Oklahoma City, Oklahoma 73102
Telephone: 405-546-3774
Facsimile: 405-546-3775
www.ogletree.com

Samuel R. Fulkerson
(405) 546-3751
sam.fulkerson@ogletree.com

July 9, 2026

**Via EEOC Respondent Portal**

EEOC Investigator
U.S. Equal Employment Opportunity Commission
Oklahoma Field Office
215 Dean A McGee Avenue, Suite 524
Oklahoma City, OK 73102

RE: Shadi Khademi v. Oklahoma Medical Research Foundation
EEOC Charge No.: 564-2026-02415

To whom it may concern:

On October 17, 2018, the Oklahoma Medical Research Foundation ("OMRF") hired Shadi Khademi, Ph.D. as an assistant staff scientist in the laboratory of Benjamin Miller, Ph.D. Although Dr. Khademi had a strong interest in neurobiology, Dr. Miller's lab did not work in this area.

One month later, Tommy Lewis, Jr., Ph.D. opened his laboratory at OMRF. Dr. Lewis had just finished his post-doctoral training, and this marked the beginning of his career as an independent scientist. His research would focus on the role that a part of the cell called the mitochondria play in the functioning of neurons and in neurodegenerative diseases like Alzheimer's and Parkinson's.

After Dr. Lewis opened his lab, Dr. Khademi approached him about transferring to his lab, indicating she was interested in working on the research topics he was studying. Following discussions with Dr. Miller and the OMRF Human Resources Department, Dr. Khademi began employment in Dr. Lewis' lab on October 1, 2019.

Although Dr. Lewis at first believed Dr. Khademi would fit well in his lab based on work she had done in her post-doctoral fellowship and her initial performance in his lab, she failed to progress at developing the skills required of a Ph.D.-trained assistant staff scientist. In particular, she was error-prone in her experiments and failed to demonstrate the attention to detail required for precise surgical procedures on laboratory mice. Dr. Lewis repeatedly spent time with Dr. Khademi attempting to help her remedy these problems, but she continued to make errors while performing these surgical

procedures. As a result, she was unable to generate any data that would lead to scientific publications, which are one of the key metrics of laboratory productivity for researchers like Dr. Lewis.

Dr. Lewis met with Dr. Khademi regularly and emphasized the need for her to focus on her work. He also emphasized the need to focus during her annual performance reviews. However, the problems persisted, and Dr. Khademi spent significant portions of her meetings with Dr. Lewis discussing personal issues. She also frequently took personal phone calls in the middle of workdays. During her time in Dr. Lewis' lab, Dr. Khademi largely kept to herself. Her interaction with other lab personnel was minimal, and she did not take any initiative to mentor or train the more junior staff – two research technicians – then in the lab.

Toward the end of her time at OMRF, Dr. Khademi – who was working in the United States on an OMRF-sponsored H-1B visa – developed issues with her visa. In September of 2022, Dr. Khademi took Family Medical Leave from her job at OMRF. In that same month, on September 22, 2022, her H-1B visa expired. As a result, OMRF terminated her employment.

Dr. Lewis, who at that time had only a single grant from the National Institutes of Health, chose not to refill Dr. Khademi's position. However, on March 29, 2026, after he learned he'd be receiving a new National Institutes of Health grant, Dr. Lewis posted a position to hire an assistant or associate staff scientist.

In the intervening three-plus years, Dr. Lewis' lab had grown significantly. He'd added four graduate students and a post-doctoral researcher. As his research career had progressed, he'd recognized that he needed to devote more of his efforts to writing grants and scientific papers and could no longer spend as much time in the lab performing experiments and mentoring laboratory staff. So, with the additional funding support he'd receive from his new grant, Dr. Lewis decided to add a new staff scientist. That person would have two primary roles: 1. Performing the scientific experiments that are central to his lab's success; and 2. Mentoring and managing the graduate students, post-doctoral fellow and other junior staff in his lab.

Through OMRF's website, Dr. Khademi submitted multiple applications for the staff scientist position. Those applications, along with all others for the position, went to Dr. Lewis. He reviewed each application and decided whether to: 1. advance an application in the system, which would lead to an interview of the applicant; or 2. "disposition" the application, which terminates the application and generates an email rejection letter that is sent to the applicant.

When Dr. Lewis reviewed Dr. Khademi's applications, he decided to disposition them. Contrary to Dr. Khademi's assertion in the Charge of Discrimination she filed with EEOC, this decision had nothing to do with her sex. Rather, he concluded that she lacked the requisite skillset for the position. Specifically, based on his three years of observing her job performance and working with her, he determined that she could not adequately perform the laboratory experiments that were essential to his lab's success. Based on his observations of her previous time working in his lab, he also concluded that she had failed to show the mentoring skills that were necessary for this position.

On June 16, 2026, OMRF sent Dr. Khademi an email indicating that she would not be hired for the position. The next day, she sent an email to OMRF requesting a meeting to discuss the decision. That same day, she filed her Charge of Discrimination with the EEOC.

Sincerely,

Samuel R. Fulkerson

SRF:da

August 6, 2026

U.S. Equal Employment Opportunity Commission
Oklahoma Field Office
215 Dean A. McGee Avenue, Suite 524
Oklahoma City, Oklahoma 73102

RE: Shadi Khademi v. Oklahoma Medical Research Foundation
EEOC Charge No. 564-2026-02415
Charging Party's Rebuttal to OMRF's Position Statement

Dear Investigator:

I submit this rebuttal to correct material factual inaccuracies and misleading characterizations in the Oklahoma Medical Research Foundation's ("OMRF") July 9, 2026 position statement. I agree that the position statement's first three paragraphs generally describe how I came to work at OMRF. I dispute, however, OMRF's later portrayal of my scientific work, technical competence, attention to detail, relationships with colleagues, mentoring activity, and qualifications for the staff-scientist position posted in March 2026.

OMRF relies primarily on broad retrospective labels such as "error-prone," unfocused, minimally interactive, and lacking initiative without identifying the dates, experiments, surgical procedures, contemporaneous records, performance-review language, or witnesses supporting those labels. OMRF also equates an alleged lack of publishable output with an inability to generate meaningful data, without addressing the data, presentations, manuscript and grant work, training activity, or pandemic-related constraints described below. Its account should be assessed against the contemporaneous documentary record rather than accepted as a complete description of my performance.

## I. OMRF's Specific Allegations and My Response

### A. I Made Meaningful Scientific Progress and Generated Substantial Data

OMRF asserts that I "failed to progress" in developing the skills required of a Ph.D.-trained assistant staff scientist and that I was unable to generate data that would lead to scientific publications. That characterization is incomplete and misleading.

I generated substantial experimental data, repeatedly presented that data during laboratory meetings, and advanced the projects assigned to me. My work produced material sufficient for scientific discussion, formal presentations, manuscript development, and later use in a professional interview. OMRF's position statement does not identify any particular assigned project that I supposedly abandoned, any objective milestone I failed to meet, or any contemporaneous document stating that I had generated no meaningful data.

My education and background were in Human Bioenergetics (at the level of molecular and cellular bioscience and bioenergetics), which was directly relevant to the work I performed in Dr. Lewis's laboratory. I conducted complex experiments using sophisticated technology, including

live-window capture imaging, advanced microscopy, and work involving a two-photon microscope. I also developed manuscript materials concerning aging and mitochondrial function.

I presented my work on 11/14/2023 as a candidate for research path at the University of Texas Health. Attached as **Exhibit [3]** is the presentation I created. It reflects the scientific substance of my work, the data I generated, the methods I used, and the progress I made. Where available, the presentation should be accompanied by the underlying data files, laboratory notes, metadata, and meeting records so that the work can be evaluated objectively.

The absence of a completed publication during my tenure is not the same as an absence of data, progress, or scientific contribution. Publication depends on multiple factors beyond one scientist's control, including project design and maturity, supervisory decisions, equipment availability, the sequencing of laboratory priorities, manuscript timing, and whether the principal investigator elects to submit the work. OMRF's conclusory statement does not address those distinctions.

**B. OMRF Does Not Identify the Alleged Experimental or Surgical Errors**

OMRF states that I was "error-prone" in experiments, lacked the attention to detail required for surgical procedures on laboratory mice, and continued to make errors despite Dr. Lewis's assistance. I dispute that characterization.

The position statement does not identify:

- any specific procedure in which an alleged error occurred;
- the date of any alleged error;
- the protocol or standard allegedly violated;
- whether the alleged issue was documented in a laboratory notebook, animal-use record, incident report, corrective-action record, email, or performance evaluation;
- whether other researchers experienced similar troubleshooting issues with the same procedures;
- whether equipment, materials, protocol development, or training affected the result; or
- any discipline, warning, remediation plan, or contemporaneous notice provided to me.

Those omissions matter because sophisticated scientific work frequently requires troubleshooting, protocol refinement, replication, and additional analysis. An unsuccessful or inconclusive experimental result is not, by itself, evidence of carelessness. Any assessment should distinguish ordinary scientific troubleshooting from a documented failure to follow an established protocol.

I was trusted to conduct complex experiments and to train, mentor, and support other laboratory personnel. I was also entrusted with reviewing manuscript materials. Those responsibilities are difficult to reconcile with OMRF's present assertion that I was persistently careless or incapable of performing reliable scientific work. I ask that OMRF be required to identify each alleged error with its date, governing protocol, contemporaneous documentation, and the treatment of comparable errors or troubleshooting by other laboratory personnel.

**C. I Did Not Receive the Performance Warnings OMRF Now Describes**
OMRF asserts that Dr. Lewis met with me regularly, repeatedly emphasized that I needed to focus, and raised the same issue during annual performance reviews. I did not receive negative performance feedback of the nature or severity now described. I was not told that OMRF considered me persistently inadequate, unusually error-prone, unable to perform essential experiments, or deficient in the attention to detail required for my position.

If OMRF contends that these criticisms were recorded in annual reviews, those reviews are the best contemporaneous evidence. The EEOC should compare OMRF's present narrative with the actual review language, ratings, goals, acknowledgments, improvement plans, and any written response by me. OMRF should also identify the date and substance of every meeting in which it claims these concerns were communicated.

The absence of contemporaneous written criticism, progressive counseling, a performance-improvement plan, or documented corrective action would undermine OMRF's claim that the alleged deficiencies were longstanding, repeatedly communicated, and serious enough to disqualify me more than three years later. Conversely, any positive or satisfactory review language, continued assignment of complex work, or continued reliance on me to assist others should be considered in evaluating the credibility of OMRF's retrospective account.

**D. Personal Matters and Telephone Calls Did Not Prevent Me From Performing My Work**
OMRF asserts that I spent "significant portions" of meetings discussing personal issues and "frequently" took personal telephone calls during workdays. This allegation is vague, unsupported, and presented without any connection to an identified missed deadline, neglected experiment, attendance violation, or written counseling.

Like many employees, I experienced personal challenges during this period. They did not prevent me from fulfilling my responsibilities or remaining productive. OMRF does not identify how many calls supposedly occurred, their duration, any policy they violated, whether similar incidental calls by other employees were permitted, or any occasion when a call caused me to miss an assigned task. Nor does OMRF distinguish between personal discussions, communications related to health or leave, and ordinary supervisory conversations.

I remained engaged in laboratory work, presentations, manuscript and grant activity, scientific reading, and support of colleagues. A fair assessment should rely on work product and contemporaneous records rather than generalized references to personal matters.

**E. I Was Not Isolated, Unapproachable, or Unwilling to Mentor Junior Staff**
OMRF asserts that I largely kept to myself, had minimal interaction with other laboratory personnel, and took no initiative to mentor or train two research technicians. I dispute each of those assertions.

I regularly interacted with colleagues, assisted and supported laboratory members (Patrycja Szybowska, Parker Kneis), and participated in the laboratory's social and professional life. My coworkers and I took coffee breaks and ate lunch together. More importantly, I trained, mentored, and provided scientific or technical support to other personnel. In the final submission [Abstract

in exhibit 5], I will identify the individuals involved, the approximate dates, the techniques or tasks covered, and any corroborating communications or work records which will be included and not limited to Bertha Osei and Klaudia Strucinska for their help in preparing the insert constructs and with genetic engineering (2020-2022), Animal husbandry core and microscope facility core at OMRF for training and providing the recourses (2020-2022).

OMRF's position statement does not identify the two technicians, the training Dr. Lewis allegedly expected me to provide, when that expectation was communicated, any request I declined, or any evaluation stating that I failed a mentoring responsibility. The EEOC should distinguish between a documented assigned duty and an after-the-fact assertion that I should have shown more "initiative." It should also consider testimony from laboratory personnel who directly observed my interactions and assistance.

**F. Pandemic and Institutional Constraints Affected Laboratory Timing**
OMRF's position statement omits important context concerning laboratory operations during 2020 and 2021. During the COVID-19 pandemic, work protocols changed, employees worked remotely during portions of the relevant period, and supply-chain disruptions delayed needed materials and equipment. Shipments associated with the two-photon microscope were among the delays affecting the laboratory.

Those conditions were outside my control. My team and I adapted by working on tasks and projects that could proceed, continuing work during remote operations, and addressing matters within our control. Delays attributable to access restrictions, shipping, materials, equipment, or institutional decisions should not be recast as an individual performance failure.

I will provide available records reflecting these constraints, such as travel bans for shipments and lab closures on top of the flood when Two Foton Microscope got damaged. Exhibit [9]. OMRF should likewise produce laboratory-wide records showing access restrictions, equipment availability, supply delays, and how project timelines for other researchers were affected during the same period.

## II. My Record Is Consistent With the Core Duties OMRF Identifies for the 2026 Position

OMRF states that the March 29, 2026 staff-scientist position had two primary functions: performing experiments central to the laboratory and mentoring or managing graduate students, a postdoctoral fellow, and junior staff. OMRF then states that Dr. Lewis rejected my applications because he concluded from my prior employment that I could perform neither function adequately.

My actual work addresses both stated functions. During my employment, I:

- performed complex scientific experiments and advanced imaging work;
- generated and analyzed experimental data;
- regularly presented research progress and findings at laboratory meetings;
- completed a grant draft;

- prepared a 2022 manuscript titled **"Mini-Review: Role of Mitochondrial Biogenesis in Brain Aging"**;
- reviewed scientific manuscript materials;
- remained current on publications and developing techniques in my field;
- communicated research findings, with mentor approval, through conferences, papers, and abstract submissions; and
- trained, mentored, assisted, and supported laboratory personnel.

These activities Exhibit [4-8]are directly relevant to experimental performance, scientific communication, and support or development of junior personnel. They should be evaluated through the underlying work product and witnesses, not excluded by generalized characterizations.

OMRF's position statement also does not disclose the selection criteria or scoring rubric used in 2026; whether Dr. Lewis documented his reasons when he dispositioned my applications; the identity, sex, and qualifications of candidates interviewed; the identity, sex, and qualifications of the person selected, if any; or whether the stated criteria were applied consistently to all applicants. Because my charge alleges sex discrimination, those records are material to assessing whether the explanation now offered was the actual and consistently applied reason for the decision.

## III. OMRF's Visa Narrative Does Not Resolve the Disputed 2026 Hiring Decision

OMRF states that my H-1B status expired on September 22, 2022 and that it terminated my employment as a result. OMRF further states that Dr. Lewis did not refill my position at that time because he had only one National Institutes of Health grant, but posted a new assistant- or associate-staff-scientist position on March 29, 2026 after learning that he would receive a new grant.

The reason OMRF gives for the end of my 2022 employment does not establish that its 2026 refusal to interview or hire me was nondiscriminatory. The challenged 2026 decision must be evaluated on its own record: the posted requirements, my applications and qualifications at that time, the criteria actually used, the treatment of other applicants, the timing and documentation of Dr. Lewis's stated reasons, and the identity and qualifications of the candidates who advanced.

OMRF acknowledges that it sent the rejection on June 16, 2026, that I requested a meeting the next day, and that I filed my EEOC charge that same day. My prompt request to discuss the decision is consistent with my genuine concern that the rejection did not fairly account for my qualifications and work history.

## IV. Documents and Information Relevant to Credibility

I respectfully ask the EEOC to review or request the following evidence:

1. My complete personnel file, including all annual reviews, ratings, supervisory notes, counseling, discipline, improvement plans, and acknowledgments.

2. Laboratory notebooks, animal-procedure records, incident reports, protocol-deviation records, training records, emails, and other documents concerning each alleged experimental or surgical error.
3. My presentations, underlying data, laboratory-meeting schedules and minutes, manuscript drafts, grant materials, abstracts, conference materials, and document metadata.
4. Records identifying the laboratory personnel I trained or assisted and the nature of that support.
5. COVID-19 access protocols, remote-work instructions, supply and shipping records, equipment-delivery and maintenance records, and project timelines for the laboratory.
6. The March 29, 2026 job posting, complete job description, selection criteria, interview rubric, applicant-tracking history, and records showing when and why each of my applications was dispositioned.
7. Contemporaneous communications or notes reflecting Dr. Lewis's reasons for rejecting my applications before OMRF received notice of my EEOC charge.
8. The applications, interview records, sex, qualifications, and disposition of candidates who advanced, and the same information for the selected candidate, if the position was filled.
9. Records showing whether OMRF applied the asserted experimental and mentoring criteria consistently to all candidates.

## Conclusion

I respectfully dispute OMRF's assertions concerning my scientific progress, technical competence, accuracy, focus, reliability, collegiality, and mentoring activity. Its position statement supplies broad conclusions but few verifiable particulars. My actual work included complex experiments, generation and presentation of data, manuscript and grant activity, continued scientific study, and training and support of other laboratory personnel. Pandemic restrictions, supply disruptions, and equipment delays also provide essential context for evaluating project timing.

The EEOC should compare OMRF's present account against the contemporaneous evidence: performance reviews, laboratory records, presentations, data, written scientific work, communications, witness testimony, and the complete 2026 selection record. It should also examine whether OMRF's stated criteria were documented at the time and applied consistently to candidates without regard to sex.

I am prepared to provide additional supporting materials, including meeting notes, research timelines, presentation materials, underlying data, manuscript drafts, grant materials, abstract submissions, and witness information. I respectfully request that the EEOC evaluate that evidence before crediting OMRF's unsupported labels and retrospective characterizations.

Thank you for your consideration.

Respectfully submitted,

Shadi Khademi

Shadi Khademi
Charging Party

## Proposed Exhibit List

- **Exhibit 1:** March 29, 2026 job posting and job description

  The Oklahoma Medical Research Foundation (OMRF) posted a career opening in **March 2026** for an **Assistant/Associate/Staff Scientist** in the **Lewis Lab.** This position is part of the **Aging & Metabolism Research Program** led by **Dr. Tommy Lewis in Oklahoma City, OK.**

  Key details for this role include:

  - **Focus:** The lab studies the unique roles of **mitochondria in neurons,** specifically how mitochondrial compartmentalization affects neuronal development, aging, and neurodegeneration.
  - **Salary:** Estimated between **$60,000 and $108,000** annually.
  - **Techniques:** Research utilizes **in vitro** and **in vivo** methods, including **two-photon microscopy, in utero electroporation,** and **proteomics.**
  - **Application:** Candidates should submit their CV and a brief email describing their experience to **tommy-lewis@omrf.org** or apply via the OMRF HR portal.

-

**OMRF Careers: Application Received**
1 message

**OMRF Talent Acquisition** <do_not_reply@clearcompany.com> Wed, May 27, 2026 at 8:24 PM
To: shadi.khademi@alumni.colostate.edu

Dear Shadi,

Thank you for your interest in Oklahoma Medical Research Foundation (OMRF) and the Assistant/Associate/Staff Scientist – Lewis Lab position. We have received your application and it is currently under review. If your qualifications fit the specifications of the position, we will contact you regarding the next steps.

We appreciate your interest in employment with OMRF.

Sincerely,

OMRF Talent Acquisition Team

OMRF [illegible]

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

[illegible]

-

- **Exhibit 2:** Charging Party's 2026 application materials

---

## CHARGE OF DISCRIMINATION

Form 5 (06/24)

This form is affected by the Privacy Act of 1974.
See attached Privacy Act Statement and other information before completing this form.

| CHARGE PRESENTED TO: | AGENCY CHARGE NO. |
|---|---|
| EEOC | 564-2026-02415 |
| Oklahoma Attorney General's Office, Office of CR Enforcement | |

Name *(indicate Mr., Ms., Mrs., Miss, Dr., Hon., Rev.)*: Shadi Khademi

Phone No.: (970) 412-3597

Year of Birth:

Mailing Address: 2201 N. Shartel Ave.

Oklahoma City, OK 73103

Named below is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency that I believe discriminated against me or others.

Name: Oklahoma Medical Research Foundation

No. Employees, Members: 201 - 500 Employees

Phone No.:

Mailing Address: 825 NE 13th St

Oklahoma City, OK 73104, UNITED STATES OF AMERICA

Name:

No. Employees, Members:

Phone No.:

Mailing Address:

DISCRIMINATION BASED ON:

Sex

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 05/01/2026

Latest: 06/04/2026

THE PARTICULARS ARE:

I was previously employed by the above referenced employer from on or around October 8, 2018, until I took FMLA, on or around September 22, 2022. I had no discipline and I was a high performer during my previous employment.

On or around May 1, 2026, I applied for Assistant/Associate/Staff Scientist-Lewis Lab, which was the same position that I was

---

DISCRIMINATION BASED ON:

Sex

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 05/01/2026

Latest: 06/04/2026

THE PARTICULARS ARE:

I was previously employed by the above referenced employer from on or around October 8, 2018, until I took FMLA, on or around September 22, 2022. I had no discipline and I was a high performer during my previous employment.

On or around May 1, 2026, I applied for Assistant/Associate/Staff Scientist-Lewis Lab, which was the same position that I was successful at previously.

On or around June 4, 2026, I received an email stating that they had chosen to proceed with other candidates whose qualifications and experience more closely match the needs of the position. I was not offered an interview and after requesting clarification as to why I was less qualified, I was ignored.

I believe I was not hired for the position based on my sex (female), in violation of Title VII of the Civil Rights Act of 1964, as amended.

EEOC Form 5 (06/24) Page 1 of 3

---

EEOC No. 564-2026-02415 | FEPA No.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct, and that I have read each page of this form.

Digitally Signed By: Shadi Khademi

06/24/2026

Charging Party Signature & Date

- 

- **Exhibit 3:** Most recent laboratory presentation, dated 11/14/2023






Compartmentalized neuron/ Compartmentalized mitochondria




Nature Communications (Nat Commun) ISSN 2041-1723 (online)

What is the role of mitochondrial morphology and function in brain aging?

- <u>Traditional methods lack the sensitivity and specificity to deal with the compartmentalized nature of neuronal structure</u>
  - *Assessing changes in protein expression involved in mitochondrial dynamics machinery in vitro and lack real time data*
  - *Hardly distinguish the location of specific protein related to protein dynamics in each compartment*
- <u>One consistent result observed across these studies is an increase in the heterogeneity of mitochondria morphology with age</u>

Research Questions:

What is the pattern of mitochondrial fission/fusion in different compartments of layer II/III cortical neurons in aged mice compared to young mice? And if any, does it affect mitochondrial function? If so, does it affect synaptic function?

**<u>Hypothesis</u>: mitochondrial fission is increased with aging**

<u>Aim</u>: To measure the actual rates of mitochondrial fission and fusion in axons and dendrites *in vivo* and to test the role of changes in mitochondrial morphology in neuronal aging by comparing aged to young animals

<u>Approach</u>: To use two photon imaging in combination with AAV based *in vivo* labeling of mitochondria in different compartments of neuronal cells in specific brain regions

- Install cranial window for live imaging (transcranial 2-photon microscopy)



- Different timelines after viral delivery of mtYFPtdTomato construct (pENN.AAV.hSyn.Cre.WPRE.hG- AAV9 and AAV9-hSyn-DIO-mtYFPp2aTdTomato) in cranial window

2 wks post injection:




3 wks post injection:




**Mitochondria distribution in Dendrites versus Axons**




- In vivo imaging for 30 minutes (mitochondria after mtPAGFP photoactivation)



**Conclusion**

- Mitochondria dynamics can be visualized in different compartments of neurons in real time by two-photon microscopy to compare changes in young versus old animals

- **Exhibit 4:** Selected underlying data, laboratory notes, and project timeline

## Link to Shadi Khademi Lab Notebook:

https://1drv.ms/u/s!AsLuL2FUFl1hfZjCKH73pM7Zpec

**STANDARD OPERATING PROCEDURE**

**Genotyping:**

A. DNA extraction (Hotshot method via tail snip for extracting genomic DNA)

**B. Amplifying DNA template by PCR (Polymerase Chain Reaction)**

C. Visualizing the region of interest via Agarose gel Electrophoresis

| | |
|---|---|
| SOP File Name: Genotyping A. DNA Extraction | Date created: 1/17/19 |
| Revision number and Date: | Reviewer name(s): |
| Saved: | Date(s) Reviewed: |
| Page 1 of 5 | Effective Date: |

**Author(s):** Shadi Khademi
**Title(s):** Staff Scientist
**Approved By, Date:**

| Revision number | Date | Responsible Person | Reason for change |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**Title:** PI

1. **Scope/Purpose:** This SOP describes setting up a PCR reaction, a technique for specific amplification of a short defined segment of DNA. This method may be modified according to the individual parameters required in any particular experiment. Each PCR protocol has been saved in a separate Excel sheet and kept at shared drive.
2. **Safety and Protective Attire:** Make sure to follow all the lab safety rules.
3. **Training:** The polymerase chain reaction, or PCR, replicates single-stranded DNA from a template using synthetic primers and a DNA polymerase. PCR is a biochemical process capable of amplifying a single DNA molecule into millions of copies in a short time. Amplification is achieved by a series of three steps: 1. denaturation, in which double-stranded DNA templates are heated to separate the strands; 2. annealing, in which short DNA molecules called primers bind to flanking regions of the target DNA; and 3. extension, in which DNA polymerase extends the 3' end of each primer along the template strands. These steps are repeated ("cycled") 25-35 times to exponentially produce exact copies of the target DNA. All DNA polymerases possess 5'→ 3' polymerase activity, which is the incorporation of nucleotides to extend primers at their 3' ends in the 5' to 3' direction. One of the best-known thermostable DNA polymerases is *Taq* DNA polymerase, isolated from the thermophilic bacterial species *Thermus aquaticus*. Lots of improvements to DNA polymerases and reagents, as well as innovations in instrumentation and the plastic vessels that hold the reactions has happened over the past years for better performance of PCR. A thermal cycler is an instrument that automates temperature cycling and

- **Exhibit 5:** 2022 manuscript, **"Mini-Review: Role of Mitochondrial Dynamics in Brain Aging"**

  Due to the copyright, the full version requires Dr. Lewis's Permission.




Fusion and fission dynamics is an essential regulator of neural stem cell (NSC) fate commitment for successful neurogenesis[1–4]. Several neurodevelopment brain disorders have disruption in mitochondrial dynamics[5–9]. Conditional knockout of mitofusin2 (MFN2), a major protein of fusion machinery, in the cerebellum results in smaller cerebella and motor deficits[10] whereas brain specific deletion of Dynamin-related protein 1 (DRP1), main protein of fission machinery, causes developmental defects of cerebellum[11]. Neurogenesis consists of symmetrical and asymmetrical divisions of NSCs[12,13]. Despite various studies identifying fusion-fission dynamics in symmetric versus asymmetric division under physiologic condition is unknown.¶

Presence of DNA within mitochondria makes them unique organelles. Oliveira et al in 2007 demonstrated that the loss of pluripotency and the induction of cell fate commitment upon differentiation of embryonic stem cell (ESC) occur in the presence of low levels of mitochondrial DNA (mtDNA) replication. After murine ESCs have committed to a specific lineage, mtDNA is extensively replicated, leading to the enrichment of the mitochondrial content to provide the higher levels of ATP required for further differentiation[14]. Hence, their inheritance is an especially important aspect of cell fate. Asymmetrical division is an unusual ability of NSC to divide into one daughter cell that retains stem cell properties and another that differentiates into a particular cell type. While mitochondrial inheritance is independent of cell cycle, the inheritance pattern to daughter cell in cortical neurogenesis under physiological condition is not known. Whether NCS giving rise to neurons can mimic the mtDNA replication events of stem cells as they differentiate and whether the mtDNA content alters to promote neurogenesis are conundrums.¶

Proper fusion and fission dynamics allow for appropriate mtDNA content. Fusion allows mitochondria to exchange membranous materials including various metabolites and rescue damaged mitochondria. On the other hand, fission can segregate and degrade mitochondria with impaired mitochondrial DNA, only leaving healthy mitochondria inside the cell[15]. It has been shown that mitochondria of the differentiated neurons have an elongated morphology in the developing brain[2]. Lee et al, in 2007 observed higher mitochondrial DNA content during sustained hypoxia in the neonatal rat brain emphasizing on high plasticity in the process of mtDNA content inheritance[16]. By following the fate of stem-like cells from human breast tissue Katajisto et al. found that daughter cells maintain stem-cell properties when they receive more newly produced mitochondria and fewer old ones which can be lost by fission inhibition[4]. Participation of mitochondrial genome in the

- **Exhibit 6:** Grant draft and related materials

  Due to the copyright, it requires Dr. Lewis's permission.

GFP when newly synthesized and irreversibly shifts to DsRed upon oxidation at Tyr-67 and allows for quantifiable assessment of mitochondrial structure[18]. Therefore, applying cre-recombinase technology by crossing floxed CAG-CAT-MitoTimer mice with Pax6 promoter (transcription factors expressed in neuronal progenitors and necessary for neuronal differentiation during embryonic cortical neurogenesis) that drives Cre expression will allow us to test our central hypothesis *that mitochondrial morphology and mtDNA content are different in symmetrical versus asymmetrical division during mice neocortical development.*

**Aim1. To determine the difference between mitochondrial morphology and mitochondrial DNA content in NSC progenitors versus neurons during cortical neurogenesis in mouse.**

To observe the correlation between mitochondrial morphology and DNA content during neurogenesis we will generate transgenic mice with Pax6Cre hemizygous: mitoTimer[flox/flox]. Cortical neurons will be treated with inhibitor of mitosis after anaphase at E10, E15 and E20. After 24 hours, Numb staining and labeling for progenitors and neurons will be done. Mitochondrial morphology can be detected based on green signal from mitoTimer in progenitors and neurons. mtDNA will be stained using DAPI staining.

these divisions, but maybe by E10 this isn't really an issue?

**Comment [TL4]:** How will you observe these divisions in vivo? Or know that a division has just occurred?

**Comment [TL5]:** Why are we using mitoTimer here? How does it add to what you are testing? If you want to use it there should either be an explanation of why or a later Aim that justifies it.

**Comment [TL6]:** You need to provide the inhibitor and how this would work.

**Comment [TL7]:** This is unlikely to work in vivo. There are some many nuclei everywhere I don't think we will be able to see mtDNA because the signal will be so small and weak compared to nuclear DNA. In culture it could work.


1. Mitra, K., Rikhy, R., Lilly, M. & Lippincott-Schwartz, J. DRP1-dependent mitochondrial fission initiates follicle cell differentiation during Drosophila oogenesis. *J. Cell Biol.* (2012). doi:10.1083/jcb.201110058
2. Khacho, M. *et al.* Mitochondrial Dynamics Impacts Stem Cell Identity and Fate Decisions by Regulating a Nuclear Transcriptional Program. *Cell Stem Cell* (2016). doi:10.1016/j.stem.2016.04.015
3. Kasahara, A., Cipolat, S., Chen, Y., Dorn, G. W. & Scorrano, L. Mitochondrial fusion directs cardiomyocyte differentiation via calcineurin and notch signaling. *Science (80-. ).* (2013). doi:10.1126/science.1241359
4. Katajisto, P. *et al.* Asymmetric apportioning of aged mitochondria between daughter cells is required for


## Submitted Grants

"Dynamics of neuronal mitochondria in aging", Impetus Grant, 2021

- **Exhibit 7:** Abstracts, conference materials, papers, and related approvals

### Differential effects of vitamin C or protandim on skeletal muscle adaptation to exercise.


Bruns DR[1], Ehrlicher SE[1], Khademi S[1], Biela LM[1], Peelor FF 3rd[1], Miller BF[1], Hamilton KL[1].

Author information



Abstract

Maintaining proteostasis is a key mechanism for preserving cell function. Exercise-stimulated proteostasis is regulated, in part, by redox-sensitive signaling. Several studies suggest that supplementation with exogenous antioxidants blunts exercise-induced cellular adaptations, although this conclusion lacks consensus. Our group uses a fundamentally different approach to maintain redox balance by treatment with bioactive phytochemicals to activate the transcription factor nuclear factor (erythroid-derived 2)-like 2 and downstream endogenous antioxidant pathways. We hypothesized that vitamin C (VitC) would interfere with redox-sensitive proteostatic mechanisms in skeletal muscle, whereas phytochemical treatment would permit proteostatic maintenance. We measured protein and DNA synthesis in skeletal muscle from high-volume voluntary wheel-running rats. Whereas phytochemical treatment permitted mitochondrial and other proteostatic adaptations to exercise, VitC treatment did not. During an in vitro oxidative challenge, phytochemical treatment helped maintain proteostasis, including the mitochondrial fraction while VitC did not. Our findings support the conclusion that VitC can blunt some of the beneficial adaptations to exercise. We propose that regulation of endogenous antioxidants represents a novel approach to maintain redox

balance while still permitting redox-sensitive proteostatic adaptations. NEW & NOTEWORTHY Whether vitamin C blocks aerobic exercise adaptions lacks consensus, perhaps because of approaches that only assess markers of mitochondrial biogenesis. By directly measuring mitochondrial biogenesis, we demonstrate that vitamin C blunts exercise-induced adaptations. Furthermore, we show that treatment with Protandim, a purported nuclear factor (erythroid-derived 2)-like 2 activator that upregulates endogenous antioxidants, permits mitochondrial biogenesis. We confirm that vitamin C blunts aerobic exercise adaptations, whereas Protandim does not, suggesting targeting the endogenous antioxidant network facilitates adaptations to exercise.



*KEYWORDS:*

deuterium oxide; mitochondrial biogenesis; proteostasis; redox

Exp Neurol. 2019 Jan;311:125-134. doi: 10.1016/j.expneurol.2018.09.019. Epub 2018 Sep 28.


### Self-reinforcing effects of mTOR hyperactive neurons on dendritic

# Molecular changes associated with spinal cord aging

Katarzyna M Piekarz[1,2], Shylesh Bhaskaran[2], Kavithalakshmi Sataranatarajan[2], Kaitlyn Street[2], Pavithra Premkumar[2], Debra Saunders[2], Michelle Zalles[1,2], Rafal Gulej[2], Shadi Khademi[2], Jaime Laurin[2], Rick Peelor[2], Benjamin F Miller[2], Rheal Towner[1,2], Holly Van Remmen[1,2,3]

Affiliations


- PMID: 32144690
- PMCID: PMC7205981
- DOI: 10.1007/s11357-020-00172-6

Free PMC article

Abstract

Age-related muscle weakness and loss of muscle mass (sarcopenia) is a universal problem in the elderly. Our previous studies indicate that alpha motor neurons (α-MNs) play a critical role in this process. The goal of the current study is to uncover changes in the aging spinal cord that contribute to loss of innervation and the downstream degenerative processes that occur in skeletal muscle. The number of α-MNs is decreased in the spinal cord of wildtype mice during aging, beginning in middle age and reaching a 41% loss by 27 months of age. There is evidence for age-related loss of myelin and mild inflammation, including astrocyte and microglia activation and an increase in levels of sICAM-1. We identified changes in metabolites consistent with compromised neuronal viability, such as reduced levels of N-acetyl-aspartate. Cleaved caspase-3 is more abundant in spinal cord from old mice, suggesting that apoptosis contributes to neuronal loss. RNA-seq analysis revealed changes in the expression of a number of genes in spinal cord from old mice, in particular genes encoding extracellular matrix components (ECM) and a 172-fold increase in MMP-12 expression. Furthermore, blood-spinal cord barrier (BSCB) permeability is increased in old mice, which may contribute to alterations in spinal cord homeostasis and exacerbate neuronal distress. Together, these data show for the first time that the spinal cord undergoes significant changes during aging, including progressive α-MNs loss that is associated with low-grade inflammation, apoptosis, changes in ECM, myelination, and vascular permeability.

Hi Shadi Khademi, ¶

¶

Thank you for registering for "2020 University of Washington Geroscience Symposium". ¶

For this year's UW NSC symposium, we are utilizing Slack as an online forum to interact with our speakers and share important symposium ¶

logistics and other great information for those interested in the biology of aging and geroscience! ¶

¶

Please use the following link to join the UW NSC Symposium Slack workspace: ¶

: https://join.slack.com/t/uw-nn68699/shared_invite/zt-bnj6ffoj-E55M1_2UWpBOqia3h6deOw ¶

Please submit any questions to: shelbyk3@uw.edu¶

¶

Date Time: Oct 23, 2020 08:00 AM Pacific Time (US and Canada) ¶

¶

Join from a PC, Mac, iPad, iPhone or Android device: ¶

Click Here to Join¶

Note: This link should not be shared with others; it is unique to you.¶

Passcode: 796417¶

Add to Calendar * Add to Google Calendar * Add to Yahoo Calendar ¶

¶

¶
·¤
°¤
Hi·shadi·khademi,·¶
¶
Thank·you·for·registering·for·"Inflammation·and·Aging".·¶
¶
Please·submit·any·questions·to:·kyle@afar.org¶
¶
Date·Time:·Oct·1,·2019·02:00·PM·Eastern·Time·(US·and·Canada)·¶
¶
Join·from·a·PC,·Mac,·iPad,·iPhone·or·Android·device:·¶
Click·Here·to·Join¶
Note:·This·link·should·not·be·shared·with·others;·it·is·unique·to·you.¶
Add·to·Calendar·°·Add·to·Google·Calendar·°·Add·to·Yahoo·Calendar·¶
Description:·Chronic,·low-grade·sterile·inflammation·that·occurs·with·age·(infl
has·been·observed·in·all·mammalian·species·studied,·from·rodents·to·non-hu
primates·to·humans.°·It·has·been·argued·that·aging·is·driven·by·the·age-relat
in·proinflammatory·cytokines·and·substances·produced·by·the·innate·immune
leading·to·reduced·healthspan·and·accelerated·aging.·¶

From:·Oklahoma·Nathan·Shock·Center·on·Aging·
<admin@oklahomanathanshockcenteronaging.org>¶
Subject:·Thank·You·For·Registering¶
Date:·April·8,·2021·at·1:10:15·PM·CDT¶
To:·<Shadi-khademi@omrf.org>¶
Reply-To:·<laura-otalora@ouhsc.edu>¶
¶
Hello,·Shadi·Khademi,¶
¶
Thank·you·for·registering· for·the·GeroScience·Symposium.°· **The·Zoom·link·for·the·2021·GeroScience·Symposium·will·be·emailed·to·you·on·Wednesday,·April·7,·2021.¶**
¶
If·you·have·questions· please· fill·in·the·form·on·the·Symposium·Contact·page.¶
¶
Sincerely,¶
¶
Oklahoma·Nathan·Shock·Center·On·Aging· ¶

- **Exhibit 8:** Training or mentoring communications and corroborating witness statements

## Teaching

Mentorship Pairing virtual event at SacValley AWIS, 2021

Ask Copilot | 1 of 6

Subject: RE: GeroScience Journal Club
Date: January 5, 2021 at 2:10 PM
To: Shadi Khademi, PhD Shadi-Khademi@omrf.org
Cc: Tommy Lewis Tommy-Lewis@omrf.org, Sathyaseelan, Deepa S (HSC) Deepa-Sathyaseelan@ouhsc.edu

Hi Shadi -
Fantastic -thanks for volunteering! That spot is still open, so I'll put you down for it. Attached are the guidelines for the journal club presentations.
Deepa or I will e-mail you a list of approved papers related to your topic 2-3 weeks before your scheduled journal club (or if you need it sooner, just e-mail us). You are welcome to select one of those articles or you can propose a different article. However, other articles must be sent to and approved by Deepa and me before you begin working on your presentation.

---

Heather Rice, PhD
Assistant Professor, Department of Biochemistry & Molecular Biology
Co-Leader of Basic Science Research, Oklahoma Center for Geroscience & Healthy Brain Aging
Member, Oklahoma Center for Neuroscience
University of Oklahoma Health Sciences Center

975 NE 10th St, BRC 1368A
Oklahoma City, OK 73104
Phone: 405-271-8001 x47815
Email: heather-rice@ouhsc.edu
Website: https://basicsciences.ouhsc.edu/bmb/Faculty/bio_details/rice-heather-phd-1

-----Original Message-----
From: Shadi Khademi, PhD <Shadi-Khademi@omrf.org>
Sent: Tuesday, January 5, 2021 1:30 PM
To: Rice, Heather C (HSC) <heather-rice@ouhsc.edu>
Cc: Tommy Lewis <Tommy-Lewis@omrf.org>
Subject: [EXTERNAL] Re: GeroScience Journal Club

Hi Heather,

I am willing to be a volunteer on presenting a paper for the mitochondrial section in March if there is still an opening.

I appreciate if you can please let me know if I can present and if the answer is yes what will the format be? (Do you have a paper or shall I come up with one? Or shall I ask Dr. Lewis for the paper?)

Thanks,
Shadi

Shadi Khademi
Sent from my iphone

From: UMDF Education <no-reply@zoom.us>
Subject: Thank you for attending Mito Friday Seminar Series - June 19
Date: June 20, 2020 at 10:50:08 AM CDT
To: shadi khademi <shadi-khademi@omrf.org>
Reply-To: <no-reply@zoom.us>

Hi shadi khademi,

Thank you for attending the Mito Friday Seminar Series - June 19. We hope you enjoyed our event.

Mito Friday Seminars are presented live from 12:00-13:00 ET and will be offered on-demand to registrants. If you would like to view the on-demand recording, please click the following link: https://umdf.zoom.us/rec/share/5vR-No_r2HxJUJ3u1mrOdO08JY3VX6a823cYr_UPyxnlp5DrIMR2K0lz8-Ffc5PT.

Visit www.umdf.org/mitofriday for information on upcoming topics and presenters.

---

Dear Dr. khademi:

A decision was made on "Hypoxia preconditioning promotes exercise capacity of mice by activating skeletal muscle Nrf2," for which you served as reviewer. For your records, the decision was Major Revision. The decision letter sent to the authors is at the end of this message.

On behalf of the Editors of Journal of Applied Physiology, we appreciate the voluntary contribution that each reviewer gives to the Journal. We thank you for your participation in the online review process and hope that we may call upon you again to review future manuscripts.

Sincerely,

Benjamin Miller
Associate Editor
Journal of Applied Physiology

Dear Dr. khademi:

A decision was made on "NEUROPROTECTANTS EFFECTIVE AGAINST RADIATION DAMAGE," for which you served as reviewer. For your records, the Associate Editor's decision was Reject. The decision letter sent to the authors is appended below.

On behalf of the Editors of JNP, we appreciate the voluntary contribution that each reviewer gives to the Journal. We thank you for your participation in the online review process and hope that we may call upon you again to review future manuscripts.

Sincerely,
Jan-Marino Ramirez
Editor in Chief, Journal of Neurophysiology
University of Washington
Neurological Surgery
Center for Integrative Brain Research
Seattle Children's Research Institute
Seattle, WA 98101
United States
2068848188
jan.ramirez@seattlechildrens.org

-------------------------------------------------------

- **Exhibit 9:** COVID-19 laboratory restrictions, supply delays, and equipment records

During the **COVID-19 pandemic**, the **Oklahoma Medical Research Foundation (OMRF)** drastically altered operations, ordering most staff to work from home and reducing the onsite workforce to a **"skeleton crew"** of fewer than 100 essential employees.

"COVID-19 shrinks OMRF workforce to skeleton crew

# COVID-19 shrinks OMRF workforce to skeleton crew At the close of business Friday, like so many employers, OMRF basically shut our doors. Technically, we are still open, but we have whittled our onsite workforce down to a skeleto...

oklahoman.com "

OMRF
omrf.org › 2020 › 05 › 19 › how-does-a-scientist-work-from-home

How does a scientist work from home?

May 19, 2020 · "My three dogs keep me company," said Miller, a physiologist who studies diseases of aging at OMRF. While Koru, Bailey...



To facilitate remote work, OMRF provided specific technical guidance and resources:

* **Equipment**: Employees without suitable home computers could take their **OMRF-provided desktops** home with supervisor permission, provided they had internet access.

* **Software**: **Zoom** accounts were temporarily available for remote meetings, and employees were instructed to use **Remote Desktop** connections rather than installing OMRF software on personal devices.

* **Connectivity**: The organization increased **VPN** connection limits from 50 to 200 to support the surge in remote access, and offered phone forwarding options for desk lines.

- 

In **June 2021**, a burst high-pressure water pipe at the **Oklahoma Medical Research Foundation (OMRF)** Bell Building flooded the first floor, causing approximately **6 inches** of water damage. The incident displaced personnel and resulted in an **$800,000** insurance claim for water extraction, cleanup, and equipment replacement.

OMRF
omrf.org › about-omrf › omrf-publications-videos › annual-report › annual-report-2021

Annual Report 2021

When a high-pressure water pipe in OMRF's Bell Building burst one Friday evening in June, about 6 inches of water flooded the building's first floor, home to OMRF's Advanced Magneti...

SidelineSwap
help.sidelineswap.com › hc › en-us › articles › 360013784979-COVID-19-Ship...

COVID-19 Shipping Delays – SidelineSwap

Please keep in mind that **all domestic and international shipping services are experiencing delays right now**. This includes delays to the initial...

- **Exhibit 10:** Performance evaluations and other contemporaneous feedback

OMRF

**Annual Evaluation**
**Employee Self-Assessment**

**Employee Name:** Shodi Khademi **Supervisor Name:** Dr. Lewis

Complete this self-evaluation then provide a copy to and discuss with your supervisor during a face-to-face meeting. Keep a copy of this form and your supervisor's assessment for your records then submit signed, dated copies of both forms to Human Resources (MS #14).

1. Overall Strengths
   - Independent
   - Passionate about learning
   - Trustworthy
   - Responsible
   - Nonjudgmental
   - Thankful
   - Hard working

2. Overall Areas for Improvement
   - Accept that there are many new things that I don't know in this field and it requires mentorship
   - Make sure that I know my duties as a member of a team
   - Avoid over commitments and be aware of my limits based on life balance dogma

3. Accomplishments/Achievements in Past Year
   - Established a new normal aspect of life with a focus on personal growth
   - Attended in aging seminar and reviewed one manuscript
   - Attended to several online courses and classes during COVID

4. Goals for Upcoming Year
   - Having a balance in life
   - Read more publications and know the required techniques to be more updated in my area of study and to be able to be helpful in intellectual and technical challenges as a team member
   - With mentor approval, discuss the research findings with other experts in the field via conferences, papers and abstract submissions
   - Updating my IT knowledge
   - Better time management skills

5. Additional Comments
   Thank you so for helping me to walk through a very critical stage in life and establishing a career.

_______________ _______ _______________ _______

*Annual Evaluation Employee Self-Assessment [illegible] 01-22-2015*

OMRF

**Annual Evaluation**
**Employee Self-Assessment**

OMRF

OKLAHOMA MEDICAL RESEARCH FOUNDATION
825 N.E. 13TH STREET
OKLAHOMA CITY, OKLAHOMA 73104

SHADI KHADEMI
2201 NORTH SHARTEL AVENUE
OKLAHOMA CITY OK 73103

Employee ID 6761

| | | | | | |
|---|---|---|---|---|---|
| **Advice No.:** | 90088830 | **Federal Tax Status:** | MARRIED | **State Tax Status:** | MARRIED |
| **EFT Date:** | 03/31/21 | **Federal Exemptions:** | 3 | **State Exemptions:** | 3 |
| **Period Ending:** | 03/31/21 | **Additional Federal Withholding:** | | **Additional State Withholding:** | |

**1. HOURS AND EARNINGS**

| Description | Current Hours | Current Earnings | Y-T-D Earnings |
|---|---|---|---|
| Regular | | 4,724.17 | 14,172.51 |
| **TOTAL EARNINGS:** | | 4,724.17 | 14,172.51 |

**3. TAXES**

| Description | Current Amount | Y-T-D Amount |
|---|---|---|
| Fed Inc Tax | 243.88 | 731.64 |
| OK State Tax | 125.00 | 375.00 |
| Medicare Tax | 63.90 | 191.70 |
| Soc Sec Tax | 273.22 | 819.66 |
| **TOTAL TAXES:** | 706.00 | 2,118.00 |

**OTHER BENEFITS AND INFORMATION**

| Description | Current Amount | Y-T-D Amount |
|---|---|---|
| Medical Insu | 1,740.68 | 5,222.04 |
| Dental Insur | 167.16 | 501.48 |
| Grp Trm Life | 6.40 | 19.20 |
| ER HSA Famil | 100.00 | 300.00 |
| TIAA-CREF FT | 377.93 | 1,133.79 |
| **TOTAL CONT:** | 2,392.17 | 7,176.51 |

**2. PRE-TAX ITEMS**

| Description | Current Amount | Y-T-D Amount |
|---|---|---|
| Medical Insu | 248.57 | 745.71 |
| Dental Insur | 55.17 | 165.51 |
| Health Savin | 20.00 | 60.00 |
| **TOTAL PRE-TAX:** | 323.74 | 971.22 |

**4. AFTER-TAX DEDUCTIONS**

| Description | Current Amount | Y-T-D Amount |
|---|---|---|
| Roth SRA - T | 120.00 | 360.00 |
| **TOTAL AFTER-TAX:** | 120.00 | 360.00 |

**BANKING INFORMATION**

| Account | Deposit Amount |
|---|---|
| 4280223038 | 3,074.43 |
| 100729595 | 300.00 |
| 3044581840 | 200.00 |
| **TOTAL:** | 3,574.43 |

| | GROSS | NET PAY |
|---|---|---|
| **CURRENT** | 4,724.17 | 3,574.43 |
| **YTD** | 14,172.51 | 10,723.29 |

| LEAVE RECORD: | ACCRUAL DESCRIPTION | BEGINNING BALANCE | EARNED | USED | ADJUSTMENT | ENDING BALANCE |
|---|---|---|---|---|---|---|
| | Vacation Balance | 159.57 | 13.33 | 3.00 | | 169.90 |
| | Sick Leave Balance | 186.00 | 8.00 | | | 194.00 |

**MESSAGE:**

◀ App Store LTE 3:16 PM 15%
mail.google.com

**Gmail is better on the app**
Secure, fast & organized email
OPEN

**Inbox**

OMRF Careers: Application Received

**OMRF Talent Acquisition**
to me
May 27 Details

Dear Shadi,

Thank you for your interest in Oklahoma Medical Research Foundation (OMRF) and the Assistant/Associate/Staff Scientist – Lewis Lab position. We have received your application and it is currently under review. If your qualifications fit the specifications of the position, we will contact you regarding the next steps.

We appreciate your interest in employment with OMRF.

Sincerely,

OMRF Talent Acquisition Team

App Store LTE 3:17 PM 15%
mail.google.com

Gmail is better on the app
Secure, fast & organized email
OPEN

Trash
Delete forever

OMRF Careers: [[[[INPUT POSITION NAME]]]]
Trash

**Nancy Weale via ClearCompan...**
to me
2 days ago Details

Dear Shadi,

Thank you for your interest in the Assistant/Associate/Staff Scientist – Lewis Lab position at Oklahoma Medical Research Foundation (OMRF).

We have reviewed your resume and, after careful consideration, we have chosen to proceed with other candidates whose qualifications and/or experience we believe more closely match the needs of the position.

As OMRF evolves, our needs are perpetually growing, so we encourage you to revisit our careers page and apply for positions that align with your

App Store LTE 3:17 PM 15%
mail.google.com

Gmail is better on the app
Secure, fast & organized email
OPEN

Trash
Delete forever

the Assistant/Associate/Staff Scientist –

S

**Shadi Khademi**
to Nancy
1 day ago Details

Hello Nancy,

Thanks for getting back to me about the job status. I am the best candidate for this job and I was working successfully at this position before leaving for FMLA. I appreciate to have a meeting to understand the reason why my application got denied.

We can meet either in person or over the zoom.

Thanks,

Shadi Khademi

**I never got a reply back so I called the institute and they mentioned that they are moving with other candidates without any explanation.**

OMRF

OKLAHOMA MEDICAL RESEARCH FOUNDATION
825 N.E. 13TH STREET
OKLAHOMA CITY, OKLAHOMA 73104

SHADI KHADEMI
2201 NORTH SHARTEL AVENUE
OKLAHOMA CITY OK 73103

Employee ID 6761

| | | | | | |
|---|---|---|---|---|---|
| **Advice No.:** | 90088830 | **Federal Tax Status:** | MARRIED | **State Tax Status:** | MARRIED |
| **EFT Date:** | 03/31/21 | **Federal Exemptions:** | 3 | **State Exemptions:** | 3 |
| **Period Ending:** | 03/31/21 | **Additional Federal Withholding:** | | **Additional State Withholding:** | |

| **1. HOURS AND EARNINGS** | | | | **3. TAXES** | | | **OTHER BENEFITS AND INFORMATION** | | |
|---|---|---|---|---|---|---|---|---|---|
| **Description** | **Current Hours** | **Current Earnings** | **Y-T-D Earnings** | **Description** | **Current Amount** | **Y-T-D Amount** | **Description** | **Current Amount** | **Y-T-D Amount** |
| Regular | | 4,724.17 | 14,172.51 | Fed Inc Tax | 243.88 | 731.64 | Medical Insu | 1,740.68 | 5,222.04 |
| | | | | OK State Tax | 125.00 | 375.00 | Dental Insur | 167.16 | 501.48 |
| | | | | Medicare Tax | 63.90 | 191.70 | Grp Trm Life | 6.40 | 19.20 |
| | | | | Soc Sec Tax | 273.22 | 819.66 | ER HSA Famil | 100.00 | 300.00 |
| | | | | | | | TIAA-CREF FT | 377.93 | 1,133.79 |
| **TOTAL EARNINGS:** | | 4,724.17 | 14,172.51 | **TOTAL TAXES:** | 706.00 | 2,118.00 | **TOTAL CONT:** | 2,392.17 | 7,176.51 |

| **2. PRE-TAX ITEMS** | | | **4. AFTER-TAX DEDUCTIONS** | | | **BANKING INFORMATION** | |
|---|---|---|---|---|---|---|---|
| **Description** | **Current Amount** | **Y-T-D Amount** | **Description** | **Current Amount** | **Y-T-D Amount** | **Account** | **Deposit Amount** |
| Medical Insu | 248.57 | 745.71 | Roth SRA - T | 120.00 | 360.00 | 4280223038 | 3,074.43 |
| Dental Insur | 55.17 | 165.51 | | | | 100729595 | 300.00 |
| Health Savin | 20.00 | 60.00 | | | | 3044581840 | 200.00 |
| **TOTAL PRE-TAX:** | 323.74 | 971.22 | **TOTAL AFTER-TAX:** | 120.00 | 360.00 | **TOTAL:** | 3,574.43 |

| | **GROSS** | **NET PAY** |
|---|---|---|
| **CURRENT** | 4,724.17 | 3,574.43 |
| **YTD** | 14,172.51 | 10,723.29 |

| **LEAVE RECORD:** | **ACCRUAL DESCRIPTION** | **BEGINNING BALANCE** | **EARNED** | **USED** | **ADJUSTMENT** | **ENDING BALANCE** |
|---|---|---|---|---|---|---|
| | Vacation Balance | 159.57 | 13.33 | 3.00 | | 169.90 |
| | Sick Leave Balance | 186.00 | 8.00 | | | 194.00 |

**MESSAGE:**